**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MARY McCLOSKEY, et al., | Civil Action No. 3:16-cv-00549-L (Consolidated with Civil Action No. 3:16-cv-00668-L) |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| MATCH GROUP, INC., et al., | |
| Defendants. | |

**SECOND AMENDED CONSOLIDATED CLASS ACTION**
**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs Mary McCloskey and Craig Kneller (collectively, "Plaintiffs"), by and through their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP and Bragar Eagel & Squire P.C. This investigation included, among other things, a review and analysis of: (i) Match Group, Inc. ("Match Group" or the "Company")'s public filings with the Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Match Group's investor calls; (vi) interviews with former employees and other potential witnesses with relevant information; and (vii) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION AND NATURE OF THE ACTION

1.   Plaintiffs bring this action under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), on behalf of themselves and all other persons or entities who purchased or acquired Match Group securities pursuant or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's Initial Public Offering (the "IPO"), which commenced on November 19, 2015.

2.   Historically, Match Group focused on internet dating. In 2014, it purchased The Princeton Review ("TPR") to expand its educational business. Prior to the transaction with Match Group, TPR focused on in-person test preparation services sold to large institutions. Match Group

1

quickly moved to transition TPR into a more app-based model similar to its dating products.  The process did not go smoothly.  Rather than focus on large institutional clients such as school districts, Match Group almost immediately attempted to transition TPR to individual student-based online test preparation services.

3.      TPR's old model locked in substantial income for years at a time.  The new model imposed by Match Group required TPR to be constantly selling its product to many more customers for much lower revenue per sale.  The change of focus had added negative impact to the Company because it was coupled with a new online, rather than in-person, test preparation product.  To pursue the new strategy and product, Match Group essentially removed TPR's sales staff after the acquisition.  Unsurprisingly, TPR struggled following Match Group's acquisition and leading up to Match Group's November 2015 IPO, and none of these struggles were disclosed by the Company or its officers until several months after the IPO.

4.      Another strike against TPR in the lead up to the IPO was a change in the SAT and the College Board's offering of free test preparation services.  On March 5, 2014, the College Board announced it was completely reimagining the SAT, making a large swath of TPR's products obsolete.  Further harming TPR, the College Board announced it was partnering with one of TPR's main competitors, Khan Academy, to offer free test preparation services to students.  Not only would the College Board-affiliated services be cheaper than TPR's, they would also be superior since they were affiliated with the test makers themselves.

5.      Despite all these events that were likely to harm and currently harming TPR in the run up to the IPO, Match Group publicly stated in the IPO's Registration Statement (as defined herein) that it expected *increased* sales from TPR in the second half of 2015.

6.      The Registration Statement also failed to mention or account for the fact that a large institutional tutoring contract with the U.S. Government had been delayed by nearly three months just prior to the IPO.  The contract was delayed prior to the IPO, yet the Defendants failed to disclose it until after completion of the IPO.

7.      The Defendants knew prior to the IPO that sales were decreasing, yet omitted that fact and even stated the opposite in the Registration Statement.  Further, at the time of the IPO, the Company only disclosed risks related to its dating business and fully ignored risks to the Non-dating (educational) segment.  By these actions and omissions, the Defendants have violated Sections 11 and 15 of the Securities Act as set forth herein.

## II.     PARTIES

8.      Lead Plaintiff Mary McCloskey purchased Match Group securities pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO and was damaged thereby, as described in the Certification previously filed on April 26, 2016, and incorporated herein (ECF No. 11, Ex. B).

9.      Lead Plaintiff Craig Kneller purchased Match Group securities pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO and was damaged thereby, as described in the Certification previously filed on April 26, 2016, and incorporated herein (ECF No. 11, Ex. B).

10.      Defendant Match Group is a Delaware corporation with its principal executive offices located at 8300 Douglas Avenue, Dallas, Texas 75225.  The Company's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the symbol "MTCH."

11.      Defendant Gregory R. Blatt ("Blatt") was, at all relevant times, the Chief Executive Officer ("CEO") of Match Group and the Chairman of its Board of Directors (the "Board").  Prior to serving as CEO and Chairman, Blatt served as CEO and a member of the Board of Match

Group's former parent company, IAC/InterActiveCorp ("IAC").  Blatt signed or authorized the signing of the false and misleading Registration Statement.

12.     Defendant Gary Swidler ("Swidler") was, at all relevant times, the Chief Financial Officer ("CFO") of Match Group.  Swidler signed or authorized the signing of the false and misleading Registration Statement.

13.     Defendant Michael H. Schwerdtman ("Schwerdtman ") was, at all relevant times, the Vice President ("VP") and Chief Accounting Officer ("CAO") of Match Group.  Schwerdtman signed or authorized the signing of the false and misleading Registration Statement.

14.     Defendant Gregg J. Winiarski ("Winiarski") was, at all relevant times, a director of Match Group.  While serving as a director of Match Group, Winiarski was also the Executive Vice President, Secretary, and General Counsel of Match Group's former parent company, IAC.  Winiarski signed or authorized the signing of the false and misleading Registration Statement.

15.     Defendant Joseph M. Levin ("Levin") was, at all relevant times, a director of Match Group.  While serving as a director of Match Group, Levin was also the CEO of Match Group's former parent company, IAC.  Levin signed or authorized the signing of the false and misleading Registration Statement.

16.     Each of the defendants listed in ¶¶ 11-15 are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants either signed or authorized the signing of the defective Registration Statement and, as such, is liable under the Securities Act.

17.     Collectively, Match Group and the Individual Defendants are sometimes referred to herein as the "Match Group Defendants."

18.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter to Match Group in connection with the Offering.

19.     Defendant Allen & Company LLC ("Allen & Company") served as an underwriter to Match Group in connection with the Offering.

20.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") served as an underwriter to Match Group in connection with the Offering.

21.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as an underwriter to Match Group in connection with the Offering.

22.     Defendant BMO Capital Markets Corp. ("BMO Capital") served as an underwriter to Match Group in connection with the Offering.

23.     Defendant Barclays Capital Inc. ("Barclays Capital") served as an underwriter to Match Group in connection with the Offering.

24.     Defendant BNP Paribas Securities Corp. ("BNP Paribas") served as an underwriter to Match Group in connection with the Offering.

25.     Defendant PNC Capital Markets LLC ("PNC Capital") served as an underwriter to Match Group in connection with the Offering.

26.     Defendant Cowen & Company, LLC ("Cowen & Company") served as an underwriter to Match Group in connection with the Offering.

27.     Defendant SG Americas Securities, LLC ("SG Americas") served as an underwriter to Match Group in connection with the Offering.

28.     Defendant Fifth Third Securities, Inc. ("Fifth Third") served as an underwriter to Match Group in connection with the Offering.

29.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") served as an underwriter to Match Group in connection with the Offering.

30.     Each of the defendants listed in ¶¶ 18-29 are collectively referred to herein as the "Underwriter Defendants."

31.     Collectively, Match Group, the Individual Defendants, and the Underwriter Defendants are referred to herein as "Defendants."

## III.     JURISDICTION AND VENUE

32.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. § 77k and § 77o, respectively).

33.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

34.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this Judicial District.  One or more Defendants maintain offices or conduct business within this Judicial District.  Additionally, at all times relevant hereto, Match Group's stock traded on the NASDAQ.

35.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.     RELEVANT BACKGROUND

### A.     Confidential Witnesses

36.     Plaintiffs' allegations are further supported by confidential witnesses ("CWs"), each of whom was employed by Match Group prior to Match Group's November 19, 2015 IPO.

37.     CW1 was employed by TPR from June 2010 through July 2015.  CW1 served as an Account Manager for TPR's College Readiness Program starting in June 2010 until CW1 was

later promoted to National Director of TPR's College Readiness Program in September 2013, which position CW1 held until July 2015.  According to CW1, the College Readiness Program was a program geared to offer public school students with free test-prep programs for the SAT and ACT standardized exams.  In both positions, CW1 reported to VP of Institutional Sales, Joe Guerra.

38.    CW2 was employed by TPR as an Operations Manager for the Newton, Massachusetts, field office – which oversaw TPR's sales activities throughout most of New England – from October 2015 to February 2016.

39.    CW3 was employed by TPR as an Executive Director of a TPR field office from January 2012 to August 2015.  CW3 later served as TPR's Regional Executive Director of Process and Standards Implementation from September 2015 to April 2016, and Director of Training from May 2016 to September 2016.

40.    CW4 was employed at TPR in various positions from June 2007 to August 2015, and served as TPR's National Director of School Based Programs from January 2012 to August 2015.

41.    CW5 was an Institutional Account Manager at TPR's Washington D.C. field office from May 2014 to March 2016, and was primarily responsible for setting up classes, staffing classes, assisting students, and dealing with customer service issues.

42.    CW6 was a Sales Manager – Outreach and Educational Partnerships in the Encino, California office from mid-2014 through October 2015 and reported to the Executive Director. CW6 held other positions at TPR since November 2009.

B.      **Match Group's Creation And Acquisition of TPR**

1.      **Match Group is Created, Consisting of Dating and Educational (*i.e.* Non-Dating) Segments**

43.     IAC is a media and Internet company that was founded in 1986 as Silver King Broadcasting Company.  IAC changed its name to IAC/Interactive Corp in July 2004 after a series of acquisitions and divestitures.

44.     Match.com, which according to Match Group is the largest dating site in the world, was launched in 1995.  Following the launch of Match.com, IAC launched or acquired a number of other dating websites and mobile apps, with its platform of dating products now including, among others, OkCupid, Tinder, PlentyOfFish, Meetic, and OurTime.

45.     On January 7, 2013, IAC announced that it had acquired online tutoring firm Tutor.com, which, at the time, boasted a network of over 2,500 tutors that provided on-demand one-on-one teaching sessions.  Although Tutor.com traditionally focused on core K-12 subjects, prior to its acquisition by IAC, Tutor.com had expanded into Advanced Placement, or AP, courses, college-level curriculum, and real-time writing help.  Tutor.com's personalized learning programs were offered by direct consumer subscription and through partnerships with public and academic libraries, school districts, the United States military, and colleges.

46.     On December 19, 2013, IAC announced the creation of Match Group – a wholly-owned subsidiary of IAC, which included, *inter alia*, the Match online dating business and Tutor.com, the educational, or Non-dating segment.

47.     Match Group is perhaps best known for its dating-related business platforms. Overall, Match Group operates a portfolio of approximately 45 dating products.  Dating revenue consists primarily of recurring membership fees and advertising on its dating applications and websites.

48.     As part of the reorganization, Defendant Blatt stepped down from his position as CEO of IAC and became the CEO and Chairman of Match Group.

49.     On July 28, 2014, Match Group announced an agreement to acquire TPR from Charlesbank Capital Partners.  The acquisition of TPR was completed on August 1, 2014. Thereafter, TPR subsumed Tutor.com, with both operating under The Princeton Review brand, and the combined TPR businesses continued to operate as part of IAC's Match Group subsidiary. According to a press release regarding Tutor.com published by Match Group on July 29, 2014, "[s]ervices of the combined company are expected to be offered to consumers primarily under The Princeton Review brand with Tutor.com used for certain institutional clients."

50.     Mandy Ginsberg ("Ginsberg") served as CEO of TPR from August 2014 through the November 2015 IPO, before being promoted to CEO of Match Group North America in December 2015.

51.     Following Ginsberg's promotion, Kate Walker ("Walker"), who had previously served as Senior Vice President ("SVP") of Strategy and Corporate Development at Tutor.com since February 2014 and as the CFO of TPR since September 2014, assumed Ginsberg's role as CEO of TPR in January 2016.

52.     When Match Group was preparing to go public in 2015, the IPO Registration Statement filed on Form S-1 with the SEC on October 16, 2015 stated:

> In addition to our dating business, we also operate a non-dating business in the education industry through our ownership of The Princeton Review.  The Princeton Review provides a variety of test preparation, academic tutoring and college counseling services.  We acquired this business because it relies on many of the same competencies as our dating business, such as paid customer acquisition, a combination of free and paid features, deep understanding of the lifetime values of customers, and strong expertise in user interface development.  Substantially all of our revenue from our non-dating business, or non-dating revenue, is derived directly from our students.

53.     Match Group further explained its acquisition strategy:

[W]e purchased Tutor.com and then The Princeton Review in 2012 and 2014, respectively. Successful operation of these businesses depends in substantial part on a common set of competencies with our dating business, and we believe we can expand the portfolio of assets over which we can leverage our competencies beyond dating. It is possible that we may acquire other non-dating assets if they meet the relevant criteria and provide the right value creation opportunity.

54.     Thus, at the time of the TPR acquisition, Match Group intended the TPR acquisition to be an attempt by Match Group to move its online business model from the online dating business, to online test preparation and, if successful, to other businesses. For that reason, the performance of Match Group's test preparation business was material to Match Group investors.

## 2.     Match Group's Non-Dating Business Segment:  TPR

55.     Match Group has two reportable segments:  (1) Dating, which consists of all of the Company's dating businesses globally and (2) Non-dating, which consists of the test preparation business, namely, TPR.

56.     According to the IPO Registration Statement (defined herein at ¶ 104 n.2, *infra*), Match Group "operate[s] a non-dating business in the education industry through [its] ownership of The Princeton Review.  The Princeton Review provides a variety of test preparation, academic tutoring and college counseling services."  In the IPO Registration Statement, Match Group also reported that "The Princeton Review includes Tutor.com (acquired in 2012) and The Princeton Review (acquired in 2014)."  Registration Statement, at 109.

57.     TPR generates approximately 10% of the Company's revenue.  According to Match Group, this Non-dating revenue consists primarily of fees received for in-person and online test preparation classes, access to online test preparation materials and individual tutoring services. Registration Statement, at 68.

58.     TPR is perhaps best known for its test preparation materials for K-12 standardized exams, and college and graduate-level admissions tests, including the SAT, PSAT, ACT, GRE,

GMAT, LSAT, MCAT, and AP exams.  According to a J.P. Morgan report published on December 14, 2015, the cost of SAT preparation offered by TPR to individual students can range from $599-$699 for 15 hours of preparation in a class of approximately 12 students, or $3,240-$8,400 for 24 hours of private test preparation.

59.     In addition to its test preparation services, TPR also offers tutoring and college admission services.

60.     TPR's tutoring and homework help programs are offered to consumers and institutions, including the United States military, school districts, colleges, and public libraries, through Tutor.com.  According to the same December 14, 2015 J.P. Morgan report, TPR's online tutoring services range in price from $39.99 for one hour per month to $339.99 for ten hours per month.

61.     As part of TPR's college admission counseling services, it selects 15 or more colleges it views as the best fit for the potential student and creates a personalized application strategy/plan.  As of December 2015, TPR charged $1,700 for its college admission counseling program.

62.     Finally, in addition to the online and offline test preparation services offered to individual students, students can purchase print and/or digital test preparation books.  As of August 2014, TPR owned or controlled the rights to more than 150 print and digital books.  Through third parties such as Amazon, Barnes & Noble, or Random House, a student can purchase an SAT test preparation e-book for approximately $13.99, or a paperback book for approximately $18.99.  TPR also offers books specific to certain subjects on the SAT, as well as books of SAT practice exams.

C.    **Unbeknownst To Investors, Non-Dating Sales Decline In The Second Half Of 2015**

1.    **Match Group Transitions TPR's Focus from Large Institutional Contracts and Long-Term Revenue Growth to Direct-to-Student Sales and Margin Expansion**

63.    Historically, TPR primarily offered its test preparation and college admissions services to students through large, institutional contracts.  For example, as part of its College Readiness Program, TPR contracted with school districts to provide in-person training to teachers, who then provided in-classroom preparation and tutoring services to students for AP testing and standardized college entrance exams.

64.    Following the acquisition of TPR in 2014 and prior to the November 2015 IPO, Match Group began to transition the focus of TPR from large multiyear contracts with institutional clients (*i.e.*, low volume, high price) to pay-as-you go packages and online sales to individual students (*i.e.*, high volume, low price).

65.    Former TPR employees confirm this shifting focus.  CW1, for example, reported that certain of TPR's institutional contracts with school districts in Texas were worth $1 million or more per year.  According to CW1, in El Paso, Texas alone, approximately three school districts had $3 to $4 million of contracts with TPR in 2014.  As reported by CW1, school district contracts were typically paid each October.

66.    After the acquisition of TPR by Match Group in 2014, CW1 reported that the focus on multiyear contracts and long-term revenue began to change.  For example, according to CW1, the CEO of TPR during the relevant time period, Ginsberg, disliked TPR's reliance on multiyear contracts with school districts because there was a risk of losing them and it would be difficult to make up for the loss of a million dollar contract.  According to CW1, Ginsberg indicated that it

was better for TPR to focus on individuals, *i.e.*, students "who are always coming in and out of the door."

67.     For example, according to CW1, at least as early as July 2015, Ginsberg told an account manager working under CW1's direction that the Company was no longer interested in securing multiyear contracts with school districts, and that the Company wanted the sales team focused on sales to individual students instead.

68.     Moreover, according to CW1, by July 2015, TPR had laid off much of its sales staff who had worked on TPR's core College Readiness Program, as well as nearly all of its employees in key leadership positions (including TPR's VP of Institutional Sales, Joe Guerra), and replaced TPR management and executive positions with individuals from Tutor.com.  CW1 reported that the only high-ranking TPR employee who CW1 recalls remained after these management changes was TPR's SVP of Human Resources, Michelle Bergland.

69.     In addition to shifting its focus from institutional clients to individual students, TPR also shifted its focus from in-person training and in-classroom test-prep to online courses and webinars.  In line with this shifting focus away from large institutional contracts, CW1 reported that the Company began restricting CW1's ability to travel and market TPR's College Readiness Program.  Rather than in-person training sessions at public high schools, for example, CW1 was instructed to conduct webinars.  CW1 reported that after Match Group acquired TPR, the Company moved these in-person training sessions to online webinars as part of their goal to "put as much as possible online."

70.     CW1 received directions to curtail travel and focus on webinars from CW1's supervisor, Joe Guerra, who himself received instructions from Sandi White, the General Manager of Institutional Programs who was brought in after Match Group's acquisition of TPR.  CW1 felt

that the new leadership under Match Group was pushing TPR to become more of an online business with online courses and online customer service. CW1 explained:

> That's what they do – Match.com is online, all of their companies are online. In their minds, that is the way to do it. The Princeton Review had a very different clientele and very different mindset. It was a big change. We needed online because there are some people who wanted online. But you also can't replace live.

71.     CW1 was concerned that schools operate differently than the business world and many were not technologically savvy enough to feel comfortable with webinars and that the push to an online business detracted from TPR's previous culture as a face-to-face, in-person test-prep business. Moreover, between 2015 and 2016, CW1 reported that TPR lost its contracts with all three El Paso school districts, as well as a number of contracts with other school districts in Texas. Had these contracts been renewed, they would have been due for payment in October 2015.

72.     CW4, who oversaw the development and implementation of TPR test preparation courses at schools across the country, also reported that, following the acquisition by Match Group, TPR shifted its focus to online courses, even for schools that continued to maintain large contracts with TPR. Specifically, CW4 explained that TPR was developing an online dashboard for web-based programs in schools and intended for training programs and services to primarily be offered online.

73.     Similarly, CW3 reported that after Match Group acquired TPR, it began to consolidate classes with low student enrollment into online courses, rather than consolidating classes geographically to maintain in-person training. CW3 reported that the new consolidation policy frustrated many students who had signed up with TPR to receive in-person training, and resulted in students cancelling their purchase.

74.     CW5 confirmed that TPR either cancelled or consolidated classes that had low student enrollment or did not meet the profit margin requirements that Match Group had

implemented after it acquired TPR in 2014.  CW5 reported that the only replacement class for students was often online.  Specifically, CW5 reported that 45 to 50% of students enrolled in classes that had been cancelled or consolidated classes were thereafter limited to switching to an online course, and of that group, only 60% opted to enroll in the online course.  CW5 reported that, ultimately, fewer in-person classes were offered in 2015 than in years prior.

75.     While "[t]he direction from above was to push the students from in-person courses into a live online," CW5 reported that this often resulted in customer complaints.  In CW5's experience, students in the Washington D.C. area preferred "brick and mortar" classes to online classes, and TPR "found the level of satisfaction when switching from in person to online was not 100% positive."  CW5 "kn[ew] that the level of satisfaction among customers tended to go down" and "[i]t impacted our ability to service [TPR's] customers."  Due to this unhappiness, TPR was forced to offer incentives for students to enroll in or switch to online courses, which negatively impacted financial results.

76.     Similarly, CW6 confirmed that after Match Group acquired TPR, the Company increased the minimum profit margin required to a run a test-prep course.  Based on the formula that the Company developed, staff would cancel a class if there were not enough students enrolled to meet the minimum profit margin.  Due to this higher profit margin requirement, more in person classes were cancelled in 2015 than in previous years.  According to CW6, TPR's sales "model" was to schedule several classes during a test-prep period, let students sign up, then consolidate the students into a smaller number of classes.  He described this as, "Creating the need, then generating the demand."  Meaning, the Company purposely scheduled more classes than it knew would be run, then once students were committed to taking a course, consolidating them into fewer classes.  CW6 confirmed that after the acquisition by Match Group, about 50 percent of students in

cancelled classes were only offered an online class as a replacement, and the Company often had

to offer students a discount to retain them.  CW6 stated that online classes were harder to sell

because most students preferred a classroom setting with a teacher in person.

77.     During the fourth quarter 2015 conference call on February 3, 2016, Defendant

Blatt confirmed that Match Group's focus for TPR had shifted to online business:

> I think we spent all of . . . 2015 sort of integrating the technology and we turned it
> on in Q4.  Over 10% of our Princeton Review test prep customers bought one of
> our other two products.  That is a huge jumpstart on this process.  We think that
> through the combination of ***moving that business online overall*** and creating these
> packages where a parent turns to Princeton Review for all of the things necessary
> to maximize their kids' chances to getting into college, we think we've got a very
> powerful business there.

(emphasis added).

78.     These changes were implemented to realize Match Group's goal of emphasizing

margin growth as opposed to long-term revenue growth.  In the Company's prepared remarks for

the fourth quarter of 2015, published on February 2, 2016, Match Group explained:

> We continued to make solid improvement on EBITDA performance, however, and
> made significant strategic progress.  As we've said before, the principal thesis for
> combining these educational businesses was that we believed we could offer
> multiple high-value products to parents desiring to maximize their children's
> college admissions experience, and we spent most of 2015 integrating technologies
> and refining our product offering to be able to do that.  Launching in earnest in Q4
> 2015, we were able to sell either tutoring or college admissions services to over
> 10% of our customers who also purchased one of our core test prep products, up
> from virtually zero previously.  Successfully implementing this cross-sell would
> transform the economics of this business, and we think we are off to a great start,
> with much work yet to come.  Also, ***Q4 2015 was the first quarter where we drove
> the majority of our services revenue online, and we expect that trend to continue,
> which over time should lead to margin expansion in the business.***  The Princeton
> Review should show continued strong progress in 2016, flipping from investment
> mode to bottom line contributor.

(emphasis added).

79.     During the fourth quarter 2015 earnings call held on February 3, 2016, Defendant

Blatt further explained:

> I think our strategy in [The Princeton Review] business is not a sort of near-term revenue-growth strategy, although we are expecting to grow revenue. We got a business that was $100 million plus and losing money and our play here is to really transform that business. And that transformation will lead to much higher margin characteristics and frankly, although this isn't our plan, I would take an $80 million revenue business that makes $25 million EBITDA over the other way around. **We've been focused very much on margin improvements.**

(emphasis added).

80.     During the earnings call held on February 3, 2016, Defendant Blatt also stated:

> I think this year we are forecasting revenue growth. I think **we're much less focused on revenue growth this year than we are on these margin improvements** and these – driving these other metrics. We're still trying to sort out what revenue we want and what revenue we don't want in this business and that will continue to evolve. Meaning **we are not chasing all revenue because there's higher-margin revenue and lower-margin revenue and we're still trying to figure out where to put our cards here**.

(emphasis added).

81.     Defendants reiterated these goals of transforming TPR's business during the first and second quarter of 2016. During the first quarter 2016 earnings call held on May 4, 2016, for example, Defendant Blatt stated, "We are in transformation mode. What we are really focused on here is are we migrating this business online? Are we generating real cross-sell?"

82.     Also, during the second quarter 2016 earnings call held on July 27, 2016, Defendant Swidler explained, "In terms of the non-dating [business], as we said we manage this business really for progress on its stated strategy and for positive EBITDA. **We're less focused on the revenue growth**." (emphasis added).

### 2.     Changes to the SAT and the Announcement of *Free* SAT Test Prep Services Further Dampen TPR's Test Prep Sales

83.     The SAT is a standardized test that is widely used for college admissions in the United States. The College Board – a private non-profit organization that owns and publishes the SAT – reported that a record 1.7 million students from the graduating class of 2015 took the SAT.

In comparison, the ACT exam was slightly more popular, with approximately 1.92 million students from the graduating class of 2015 taking it. TPR offers test preparation services and materials for both the SAT and ACT.

84.     On March 5, 2014, the College Board announced its intention to "expand access to opportunity" and "redesign the SAT." Major changes included: (i) testing relevant words in context, rather than obscure vocabulary; (ii) testing students' ability to support reading and writing answers with evidence; (iii) testing students' ability to analyze an evidentiary source; (iv) testing students' ability to analyze data and texts in a real world context; (v) reducing the number of math sections to focus on certain key areas; (vi) incorporating a wide range of source documents into the reading comprehension section; (vii) including a "Founding Document" or "Great Global Conversation" document in every exam; and (viii) scoring based upon correct answers, rather than deducting points for incorrect answers. The latter change was likely particularly appealing to students given the onerous 0.25 point penalty for incorrect answers on the old SAT exam. Such a penalty had the effect of dissuading nervous students from guessing answers – thus, this change in particular was seen as a benefit which would attract a higher number of students to the new SAT test. The new SAT was administered for the first time in March 2016.

85.     In addition to the above changes, as part of its initiative to "expand access to opportunity," also on March 5, 2014, the College Board announced that it would "directly confront[] one of the greatest inequities around college entrance exams, namely the culture and practice of high-priced test preparation," by partnering with the Khan Academy, a direct competitor of TPR, to "provide the world with free test preparation materials for the redesigned SAT." These free test preparation materials included practice preliminary SAT ("PSAT") exams, practice SAT exams, SAT math practice, SAT reading and writing practice, SAT tips and

strategies, video lessons, diagnostic quizzes, instant feedback, and other online examples and tutorials.

86.     According to the College Board, the free test preparation materials provided by Khan Academy became available to students beginning with the 2015/2016 school year.  The Khan Academy SAT study materials went live in June 2015, in time for students to use them in preparation for the SAT exam administered on October 3, 2015.

87.     The Khan Academy materials have been an enormous success, with the College Board reporting in June 2016 that within one year of the free Khan Academy materials being offered, more than 1.4 million users had taken advantage of the free, interactive, and personalized materials, which represents "four times the total population of students who use all commercial test prep classes in a year combined."  Indeed, the College Board reported that "[a]lmost half of all SAT takers on March 5, [2016] used [Khan Academy] SAT Practice to prepare, causing a 19 percent drop in the number of students who paid for SAT prep resources."

88.     Further, the resources that Khan Academy offers to students continue to grow, with the College Board announcing that in the second year of the Khan Academy there would be new features, such as additional practice tests, an opportunity to get help from subject-matter experts, live instruction sessions on Facebook Live, and new partnerships to help more students prepare for the SAT.

89.     In addition to the fact that the Khan Academy's test prep materials were offered *free of charge* to students, its prep courses also were created *in partnership with the College Board*. By sharp contrast, TPR independently developed its review materials based on its analysis of the tests.  CW2 reported that throughout 2015 and into early 2016, TPR and other test preparation companies did not receive samples of the new SAT exam from The College Board.  In fact, CW2

reported that TPR did not receive detailed information regarding the new SAT until close to March 2016 when the revised SAT was administered.  According to CW2, TPR could not effectively prepare students for the new SAT because TPR did not know enough about what was on it prior to March 2016.  According to CW2, the College Board's failure to distribute sample tests to TPR and other test prep companies aligned with historical practices.  Accordingly, TPR was aware that it would not receive a sample of the new SAT until just weeks prior to the March 2016 administration.

90.     Due to TPR's relative ignorance regarding the new SAT, CW2 reported that, during 2015, TPR was unable to offer test preparation courses that were designed for the new SAT. Instead, CW2 estimated that of the ten SAT test prep courses offered by TPR in the fall of 2015, perhaps one was for students preparing for the new SAT.  Yet, even this course provided only minimal information about the new SAT, and otherwise provided generalized test preparation strategies and samples of the *old* SAT.  According to CW2, who was responsible for scheduling TPR's test preparation courses, CW2 did not schedule any full test-prep courses for the new SAT until May 2016.

### 3.   Defendants Publicly Plan For Increasing Non-Dating Sales While Privately Acknowledging That They Were Decreasing

91.     Despite the above-described changes to TPR's focus (*i.e.*, the shift away from lucrative yet long-term institutional sales), the changes to the SAT, which inhibited TPR's ability to provide prep services in the fourth quarter of 2015, and the introduction of free test prep materials offered by TPR's competitor, Khan Academy – all facts likely to depress TPR's SAT prep sales in the latter part of 2015 – Match Group publicly claimed to expect an *increase* in TPR's SAT prep sales and overall revenue in the second half of 2015 (*i.e.*, during the time of the IPO). For example, when it was revealed on February 3, 2016 that the Company had missed revenue

targets due to disappointing Non-dating business performance, Defendant Blatt attempted to explain the failure as follows:

> [T]here was a big change in the SAT this year.  It happens every 10 years or so.  We made a prediction about how test takers would – *we thought some would rush to take the old test, more of them sort of paused to take the new test than we expected*.  Cost us revenue, doesn't really cost us on the bottom line.

92.     Match Group's assumption regarding an *increase* in sales despite the risks posed by the changes to the SAT and the Khan Academy was false given that the Company *knew*, prior to its November 19, 2015 IPO, that sales were *decreasing*.  According to CW2, Ginsberg and other TPR senior executives held a mandatory companywide meeting via video conference in November 2015, prior to the IPO.  CW2 recalls that the meeting was held prior to the IPO because Ginsberg announced during the meeting that employees would be able to purchase Match Group stock in the IPO at a discounted price.

93.     At this meeting, Ginsberg discussed the fact that TPR was not on track to hit its projected sales numbers, and announced cuts in spending in response.  CW2 also confirmed that, by November 2015, it was clear to the Massachusetts field office – which is the second largest producing office at TPR – that contrary to the Company's projections, students were not rushing to take the old SAT.  In fact, CW2 reported that the Massachusetts field office saw "a significant drop in sales" in the last quarter of 2015 and was at least $2 million off of their projected sales figures in the fourth quarter of 2015.  Given comments in the Company's salesforce.com forum, CW2 believed that this trend was common at TPR offices throughout the country.

94.     CW3 confirms that this trend was, indeed, common at TPR offices throughout the country.  As the Executive Director of a TPR field office, CW3 received a monthly sales report, generated by corporate headquarters, that showed revenue for different types of test preparation classes, including the SAT, for all TPR field offices.  CW3 explained that, according to these sales

reports, sales at TPR were decreasing nationwide throughout 2015 and were "[e]xtremely under . . . for year-to-year" and "overall[] sales were down for year over year" in 2015. CW3 reported that executive directors, such as CW3, discussed these sales reports with their respective Regional Vice Presidents.

95.     This decrease in sales did not come as a surprise to CW3 who explained that, contrary to Defendants' expectation that students would "rush" to take the new SAT, high school freshman or sophomores were unlikely to take the SAT early, and more likely to wait to take the SAT at an appropriate stage in their high school educations, regardless of whether it was the new or old version of the test.  For this reason, CW3 explained that: "Senior leadership . . . thought we would be able to pull sales forward for the SAT like we did with the MCAT. . . .  But you can't pull sales forward for the high school level like you can on the grad school level."

96.     Like other field offices across the country, CW5 recalled that the Washington D.C. field office was continually "in the red" in terms of profitability due to decreased sales for test preparation classes.  Specifically, CW5 reported that sales for SAT test preparation classes were down from 2014, at a time when upper management at Match Group were claiming that they expected sales to increase.  Indeed, CW5 reports that:  "I definitely remember that messaging[,]" and "[t]hey were ignoring the numbers, ignoring the trends."  CW5 also reported seeing data for regional sales numbers, which, like the Washington D.C. field office, showed decreased sales for places such as Philadelphia and North Carolina.

97.     CW6 noted that there was no significant increase in sales for college test prep courses in general during 2015.  CW6 also pointed out that there was no new advertising, marketing strategies, or a sales staff hiring push from TPR to that would have helped to increase sales during this time.  As CW6 put it, "There wasn't any new marketing to make that [increase]

happen.  They didn't change the marketing on TV. . . .   There wasn't anything new that I saw.
Even when Tutor.com took hold that created an online presence but that wasn't anything to drive
the business and build the new brand."  In addition, CW6 recalled that in the last few months of
CW6's employment in 2015, the Company began making budget cuts.  For example, the Company
cut back on mileage allowances for teachers, making it more difficult to find teaches to staff in-
person classes.  In addition, the Company stopped providing free presentations, such as a free
practice test TPR previously offered, and in 2015 began charging $5 per test.

98.     The introduction of free SAT prep materials offered by the Khan Academy and the
changes to the SAT presented significant risks to Match Group's Non-dating business segment,
which had struggled to turn a profit.  Yet, Match Group failed to warn investors of these risks
anywhere in the Offering Materials.  Indeed, as discussed further at ¶¶ 90-92, *infra*, the Offering
Materials are virtually silent on risks faced by the Company's non-dating business segment.

**D.     Fourth Quarter 2015 Also Sees A Large Government Contract Delayed**

99.     Further complicating Match Group's success story for TPR, and an additional
material omission from the Offering Materials, was the delayed execution of a large institutional
tutoring contract with the U.S. Government in the fourth quarter of 2015.

100.    As later admitted by Defendant Blatt during a February 3, 2016 conference call
discussing the Company's 2015 fourth quarter financial performance, in additional to declining
SAT test prep sales:  "We were signing a contract with the US government and it signed 2-1/2
months later than we thought.  That cost us a couple million dollars of revenue, just moved it back,
and at the time we expected to get it done earlier and it didn't."

101.    On the evening before the February 3, 2016 conference call, Match Group
published prepared remarks which similarly explained that Non-dating revenue fell short of

expectations due, in part, to "the execution of an institutional contract **later in Q4** than expected." (emphasis added).

102.    Since the contract was executed two and a half months later than expected, but still signed "later in Q4 [2015] than expected," it is not possible for Defendants to disclaim knowledge of the delayed contract at the time of the November 18, 2015 IPO.

###    E.    Match Group's November 2015 IPO

103.    On October 16, 2015, Match Group filed a Registration Statement with the SEC on Form S-1 for an offering of up to $100 million in common stock.  On November 2, 2015, the Company filed an Amended Form S-1 Registration Statement with the SEC on Form S-1/A, also for an offering of up to $100 million in common stock.

104.    On November 9, 2015, the Company filed an Amended Form S-1 Registration Statement with the SEC on Form S-1/A, and on November 16, 2015, the Company filed another Amended Form S-1 Registration Statement with the SEC on Form S-1/A, both with proposed offerings of 38,333,333 shares of common stock for a proposed maximum aggregate offering price of approximately $537 million, or $14.00 per share.  Finally, on November 18, 2015, the Company filed an Amended Form S-1 Registration Statement with the SEC on Form S-1/A, with an offering of 38,333,333 shares[1] of common stock for a proposed aggregate maximum offering price of approximately $537 million, or a maximum price of $14.00 per share.  The Registration Statement dated November 18, 2015 was declared effective after the market close on November 18, 2015.[2]

---

[1]   Match Group offered 33,333,333 shares of Class A common stock to the public, with an additional 5 million shares of Class A common stock offered to the underwriters should they exercise their option to purchase additional shares.  The underwriters exercised this option, and a total of 38,333,333 shares of Class A common stock were offered.

[2]   As used herein, the term "Registration Statement" refers to, collectively, the registration statement that was filed by the Company with the SEC on Form S-1 on October 16, 2015, all

105.    On November 19, 2015, the IPO was priced at $12.00 per share.  Together with the Prospectus filed with the SEC on Form 424B4 on November 20, 2015, the Registration Statement offered for sale 33,333,333 shares of Match Group Class A common stock to the public (and an additional 5,000,000 shares of Class A common stock to the underwriters) at $12.00 per share. Shares began trading on November 19, 2015, on the NASDAQ under the symbol "MTCH."

106.    On November 24, 2014, the Company announced that Match Group had closed its IPO of 38,333,333 shares of common stock at $12.00 per share, which included 5,000,000 shares of Class A common stock that were sold pursuant to the underwriters' option to purchase.  Upon the completion of the offering, IAC held 209,919,402 shares of Class B[3] common stock, which represented 84.6% of all outstanding Match Group shares and 98.2% of the combined voting power.  IAC also retained representation on Match Group's Board of Directors (the "Board"), such that three of the eight Match Group Board positions were held by current IAC employees, including Levin (CEO of IAC), Winiarski (Executive Vice President, Secretary, and General Counsel of IAC), and Mark Stein (Senior Vice President and Chief Strategy Officer of IAC).

**1.      In the IPO, Match Group Unlawfully Failed to Provide Any Risk Disclosures for Match Group's Non-Dating Test Preparation Business Segment**

107.    As noted, Match Group has two segments, Dating and Non-dating.  The Company's Non-dating segment consists of TPR.

108.    FASB Accounting Standards Codification Topic 280, *Segment Reporting* (ASC 280) states that the

---

amendments thereto, and the Prospectus, which was incorporated into and formed a part of the Registration Statement that became effective on November 18, 2015.

[3]  Match Group Class A common stock has 1:1 voting power, while Class B common stock has 10:1 voting power.

objective of requiring disclosures about segments of a public entity and related information is to provide information about the different types of business activities in which a public entity engages and the different economic environments in which it operates to help users of financial statements do all of the following:

a. Better understand the public entity's performance

b. Better assess its prospects for future net cash flows

c. Make more informed judgments about the public entity as a whole

ASC 280-10-10-1.

109.   Despite this, in contrast to the numerous risk disclosures in Match Group's Registration Statement relating to its dating business (*see, e.g.*, Registration Statement, pp. 16-20, discussing risks relating to the Company's "dating brands and products," the "dating industry," "dating product monetiz[ation]," "[a]ttracting and retaining users for our dating products," electronic communications with users "in the era of smart phones and messaging/social networking apps," "[d]istribution and use of our dating products," "distribution of our dating products through app stores," technological overhauls in a number of platforms, "including Match, OurTime and Meetic," there are no risk disclosures that relate directly to the Company's Non-dating segment. Indeed, apart from general risks faced by any company providing online services, such as reliance on third party technology, cyber-attacks, security breaches, and identity theft (*Id.* at 20-22), only the following generalized risk disclosures could conceivably relate to risks associated with the Company's Non-dating segment:

> Our quarterly results and operating metrics have fluctuated historically and we expect that they could continue to fluctuate in the future as a result of a number of factors, many of which are outside of our control and may be difficult to predict . . . .
>
> \*       \*       \*
>
> In addition, the variability and unpredictability of our quarterly results or operating metrics could result in our failure to meet expectations, or those of any of our investors or of analysts that cover our company, with respect to revenues or other

operating results for a particular period.  If we fail to meet or exceed such expectations for these or any other reasons, the market price of our common stock could fall substantially.

110.    Even if the foregoing risk disclosures *did* relate to Match Group's Non-dating segment, *i.e.* TPR, it is not sufficiently particularized or meaningful to inform investors of the risks and trends that the Company's Non-dating segment was facing.  Specifically, such generalized risk disclosures failed to inform investors of the risks posed by changes to the SAT, free test preparation materials provided by the Khan Academy, and/or the Company's delayed government contract.

111.    Similarly, while the Registration Statement contains an entire section devoted to, "Trends Affecting Our Dating Business," (Registration Statement, pp. 63-66) there is no parallel section devoted to trends affecting the Company's Non-dating segment.  As discussed in more detail in the sections to follow, in violation of Items 303 and 503, there is little to no discussion of trends in the Company's non-dating business in the Registration Statement at all.

### 2.    Defendants Boast About TPR's Success in Advance of the IPO

112.    Match Group reported in its Registration Statement that TPR had obtained profitability for the first time:

> Adjusted EBITDA is generally increasing sequentially and on a year on year basis, but is impacted by the aforementioned selling and marketing trends, which drive lower or sometimes negative, year on year Adjusted EBTIDA growth in the first quarter of the fiscal year.  Increased investment in Non-dating driven by the acquisition of The Princeton Review also negatively impacted Adjusted EBITDA beginning with the three months ended September 30, 2014 through the second quarter of 2015.  ***Non-dating reported positive Adjusted EBITDA for the first time in the third quarter of 2015, which is its seasonally strongest quarter.***

(emphasis added).

113.    Match Group reiterated this positive outlook on TPR by stating in its Registration Statement, "The increase in deferred revenue is primarily due to growth in membership fees in the

Dating business, *a seasonal increase in class enrollment in the Non-dating business* and acquisitions." (emphasis added).

114.    Contrary to the above positive statements:  (1) Defendants failed to disclose that an institutional contract would be executed more than two months late and that the changes to the SAT and introduction of the *free* Khan Academy materials would decrease, not increase, TPR's sales; and (2) without a risk disclosure or statement of known trends to the contrary, investors were led to believe that TPR had turned a corner and was experiencing profitability for the first time.

### F.    Match Group Misses Revenue Forecast For The 2015 Fourth Quarter Due To Underperformance by TPR

115.    For the fourth quarter of 2015, Match Group reported total revenue of $268 million, which fell short of the consensus estimate of $277 million.  Also for the fourth quarter of 2015, Match Group reported:  (a) Non-dating revenue of $26.1 million, which was below the Street's estimate of $31.2 million; and (b) Dating revenue of $241.5 million, which was in line with the consensus estimate of $241.4 million.

116.    In the Company's prepared remarks, published on the evening of February 2, 2016, immediately before the fourth quarter 2015 conference call, Match Group disclosed, for the first time:  "Non-Dating fell short of expectations on revenue in Q4 due primarily to a *greater than anticipated slowdown in SAT prep due to the launch of a new SAT and the execution of an institutional contract later in Q4 than expected*." (emphasis added).

117.    During the 2015 fourth quarter conference call held on February 3, 2016, Defendant Blatt responded to an analyst's question and further disclosed:

> Nat Schindler, Bank of America Merrill Lynch:  [C]an you go into a little more detail on the non-dating businesses?  Specifically, what caused the falloff from your expectations . . . ?
>
> Defendant Blatt: . . .  *Two things, there are two very discreet things that happened this quarter, which is one, we are signing a contract with the U.S. government*

*and it signed 2 ½ months later than we thought.  That cost us a couple million dollars of revenue, just moved it back and at the time we expected to get it done earlier and it didn't.*

*The other was, there was a big change in the SAT this year.*  It happens every 10 years or so.  We made a prediction about how test takers would – we thought some would rush to take the old test, more of them sort of paused to take the new test than we expected.  *Cost us revenue, doesn't really cost us on the bottom line.*

(emphasis added).

118.    Following the Company's disclosures after-hours on February 2, 2016 and during the earnings call on February 3, 2016, numerous analysts reported that Match Group's overall revenue fell short of expectations due to the fact that the Non-dating business segment had fallen short of forecasts for the 2015 fourth quarter.  By and large, analysts agreed that the financial results of the Company's Non-dating business segment were disappointing and drove the overall revenue miss.

119.    For example, on February 3, 2016, J.P. Morgan reported that Match Group's 2015 fourth quarter revenue fell short of expectations ($268 million versus $276 million), with the "shortfall mostly coming from the Non-Dating business."  Indeed, Match Group's Non-dating segment reported 2015 fourth quarter revenue of $26.1 million – below J.P. Morgan's estimate of $30.4 million.  J.P. Morgan explained that this shortfall was the result of:  (1) "the release of a new version of the SAT[,] [which] impacted demand for prep services;" and (2) "a delay in the timing of a sizeable contract[,] [which] weighed on revenue relative to expectations."

120.    Similarly, on February 3, 2016, UBS reported that while they were positive on Match Group's dating business segment, they were "less positive" on Match Group's non-dating business segment, which had revenue "below expectations [for the 2015 fourth quarter] driven by lower demand for test prep (after SAT change) & contract delay."  In fact, UBS reported that Match Group's overall revenue of $268 million missed the consensus estimate of $277 million,

and that this poor "[r]esult [was] driven mainly by lower than expected growth in Non-Dating revenue."  Additionally, UBS observed that the 2% year-over-year decline in Non-dating revenue was caused, at least in part, by a "delay in an institutional tutoring contract."

121.    Also on February 3, 2016, BMO Capital Markets reported that Match Group's Non-dating revenue fell short of the Street's estimate ($26.1 million versus $31.2 million) and that this shortfall was an "unexpected hiccup caused in part by changes to the SAT."

122.    Further, on February 4, 2016, Susquehanna Financial Group, LLP reported that Match Group's "total revenue . . . missed us and consensus by ~16% ***due to a slowdown in SAT prep and a delay in signing a large client***[.]"

123.    Similarly, on February 4, 2016, Barclays reported that the Company's "top-line miss was ***due to a shortfall in the non-Dating segment***."  (emphasis added).

124.    In sum, in the first quarterly results announced after the completion of the IPO, Match Group missed overall revenue estimates due to a shortfall in its Non-dating business.  This shortfall was the result of the materialization of risks that Defendants failed to disclose regarding TPR, including risks surrounding changes to the SAT test and the proliferation of *free* SAT test preparation materials by the College Board and the Khan Academy, as well as the delayed execution of a multi-million dollar institutional contract in the very quarter that the IPO took place.

125.    Following Match Group's February 3, 2016 announcement of the revenue miss and the underperformance of its Non-dating business segment, shares of Match Group's stock fell from a high of $12.82 per share on February 2, 2016, to close at $10.66 per share on February 3, 2016.  The stock price continued to fall over the ensuing days as the market absorbed the news, ultimately closing at $9.30 per share on February 5, 2016.

## V.      DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT OF 1933

126.    The purpose of the Securities Act is "to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 553 (S.D.N.Y. 2015) (The Securities Act "was a slate of unprecedented measures designed 'to place adequate and true information before the investor.'") (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986)); *see also Pinter v. Dahl*, 486 U.S. 622, 638 (1988).

127.    To effectuate this purpose, a Company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983).  Failure to do so gives rise to private rights of action under the Securities Act. *See Fed. Hous.*, 104 F. Supp. at 553-54.  "The private rights of action in the Securities Act were designed to assure compliance with [its] disclosure provisions . . . by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Id.* (quotation omitted).

### A.      Section 11

128.    Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a Company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including:  (1) "every person who signed the registration statement;" (2) "every person who was a director . . . at the time of the filing of . . . the registration statement;" (3) "every person who, with his consent, is named in the registration as being or about to become a

director;" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement;" and (5) "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1-5).

### B.      Regulation S-K

#### 1.        Item 303 Requirements

129.    Item 303 imposes an affirmative duty on issuers to disclose "events" or "uncertainties" that will have a material or unfavorable impact on the registrant's future revenue. 17 C.F.R. § 229.303(a)(3)(i) & (ii); *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4.

130.    Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations."  *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, Exchange Act Release No. 6835 ("*S.E.C. Release No. 6835*"), 1989 WL 1092885, at *4 (May 18, 1989); 17 C.F.R. § 229.303(a)(3)(ii).

131.    Pursuant to Item 303(a), for a fiscal year, a registrant has an affirmative duty to:

(i) Describe any *unusual or infrequent events or transactions* or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also S.E.C. Release No. 6835*, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or

infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

132.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of such *required* disclosures include:  "[a] reduction in the registrant's product prices; erosion in the ragistrant's [sic] market share; changes in insurance coverage; or the likely non-renewal of a material contract."  *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4 (May 18, 1989).

133.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."  *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *Id.* at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

### 2.    Item 503 Requirements

134.    Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."  *Sec. Offering Reform*, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004).  Accordingly, Item 503 requires that offering

documents "provide under the caption 'Risk Factors' a discussion of the most significant factors

that make the offering speculative or risky."  17 CFR § 229.503(c).  The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain
> how the risk affects the company and/or the securities being offered.  Generic or
> boilerplate discussions do not tell the investors how the risks may affect their
> investment.

*Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub.*

*Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers*, 1998 WL 425894, at *14 (July 29, 1998).

135.    Put simply, Item 503 provides that a registration statement must disclose all known

material risks that are "specific to the particular company and its operations."  17 CFR

§ 229.503(c).  Item 503(c) warns issuers:  "Do not present risks that could apply to any issuer or

any offering."  *Id.*

C.      **Defendants Violated Their Disclosure Obligations In The IPO Registration Statement**

136.    Defendants violated their disclosure obligations in Match Group's IPO Registration

Statement because they failed to disclose:  (a) TPR's transition from institutional contracts and

long-term revenue growth to direct-to-student and online sales and margin expansion; (b) the risks

posed by the introduction of the new SAT; (c) the risks posed by the College Board's relationship

with the Khan Academy, a direct competitor of TPR, including the free test preparation materials

offered by the Khan Academy; and (d) the delayed institutional contract.

137.    After Match Group acquired TPR in August 2014, and prior to its November 2015

IPO, Match Group began to transition the focus of TPR from large multiyear contracts with

institutional clients (*i.e.*, low volume, high price) to online sales to individual students (*i.e.*, high

volume, low price) as part of its push to drive short-term margin expansion at the expense of long-

term revenue growth.  To effectuate this transition, TPR also shifted its focus from its previous

core offerings of in-person training and in-classroom test-prep to online courses and webinars.

Despite this fundamental and systemic shift within TPR, Defendants failed to disclose in Match Group's Registration Statement either the transition itself, or the risks posed by the transition, thereby violating Section 11 and Item 503.  The failure to disclose TPR's transition away from long-term revenue growth also violated Item 303 given that Match Group was actively engaged in a business strategy that it reasonably expected and, in fact, intended to have a material unfavorable impact on revenue.

138.    Additionally, on March 5, 2014, the College Board announced its intention to redesign the SAT and to partner with the Khan Academy, a direct competitor of TPR, to provide *free* SAT test preparation to students.  The Khan Academy SAT study materials went live in June 2015, in time for students to use in preparation for the SAT exam administered in October 2015, and the new SAT was administered for the first time in March 2016.  Although these two events, both the changes to the SAT and the introduction of free test preparation by the Khan Academy, presented significant risks to Match Group's Non-dating business segment, Match Group failed to disclose in its Registration Statement either these changes, or the risks they posed, thereby violating Section 11 and Item 503.  Match Group also failed to disclose that the change in the SAT test and the free test prep offered by Khan Academy would result in fewer students purchasing TPR's SAT test prep materials in the future.  This  was material, forward-looking information regarding known trends and/or uncertainties, and Defendants' failure to disclose it is a further violation of Item 303.

139.    Defendants also failed to disclose that TPR sales were already decreasing in the fourth quarter of 2015 – *i.e.*, a known trend – thereby violating Section 11 and Item 303.

140.    Finally, Match Group failed to disclose that a large, institutional contract had been delayed at the time of the IPO.  By November 18, 2015 – the effective date of the Registration

Statement – Match Group *knew* that the large, institutional contract would be executed late and this known event was likely to have a material unfavorable impact on revenue.  Defendants' failure to disclose this known event was a violation of Item 303.  Defendants also violated Section 11 and Item 503 by omitting material information about the delayed contract and failing to disclose the risks associated with contract delays in Match Group's Non-dating business segment.

## VI.  THE REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND/OR OMITTED MATERIAL INFORMATION REQUIRED TO BE STATED THEREIN

### A.  Registration Statement and Prospectus

141.  The Registration Statement issued in connection with the IPO contained materially false and/or misleading facts, omitted to state other facts necessary to make the statements made not misleading, and was otherwise not prepared in accordance with the governing rules and regulations.

142.  The Registration Statement, in relevant part, stated:

> Adjusted EBITDA is generally increasing sequentially and on a year on year basis, but is impacted by the aforementioned selling and marketing trends, which drive lower or sometimes negative, year on year Adjusted EBTIDA growth in the first quarter of the fiscal year.  Increased investment in Non-dating driven by the acquisition of The Princeton Review also negatively impacted Adjusted EBITDA beginning with the three months ended September 30, 2014 through the second quarter of 2015.  ***Non-dating reported positive Adjusted EBITDA for the first time in the third quarter of 2015, which is its seasonally strongest quarter.***

Registration Statement (defined herein at ¶ 87 n.2, *infra*), p. 85 (emphasis added).

143.  The Registration Statement reiterated this positive outlook on TPR by stating, "The increase in deferred revenue is primarily due to growth in membership fees in the Dating business, ***a seasonal increase in class enrollment in the Non-dating business*** and acquisitions."  *Id.* at 87 (emphasis added).

144.    Further, the Registration Statement reported that for the nine months ended September 30, 2015, "Non-dating Adjusted EBITDA loss declined $4.8 million, or 45.8%, primarily due to reduced losses from The Princeton Review." *Id*. at 72.

145.    The above statements were false and misleading because they failed to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, because Defendants failed to disclose that TPR's test prep sales were decreasing and Match Group's overall Non-dating revenue was declining due to:  (i) changes in the SAT; (ii) the College Board's partnership with Khan Academy to provide free test prep; (iii) Match Group's decision to shift focus from revenue growth to margin expansion, including its related decision not to renew lucrative large contracts, to reduce sales and marketing efforts and budgets and its decision to migrate traditional business to online; and (iv) the delayed large institutional contract which was executed late in the fourth quarter of 2015.

146.    Defendants also violated Regulation S-K (Items 303 and 503) because the Registration Statement failed to disclose known events or uncertainties that were reasonably likely to unfavorably impact net sales, revenue, or income from continuing operations, and failed to include adequate risk disclosures relating to TPR's declining test prep sales and Match Group's overall decline in Non-dating revenue due to:  (i) changes in the SAT; (ii) the College Board's partnership with Khan Academy to provide free test prep; (iii) Match Group's decision to shift focus from revenue growth to margin expansion, including its related decision not to renew lucrative large contracts, to reduce sales and marketing efforts and budgets, and to migrate traditional business to online; and (iv) the delayed large institutional contract which was executed late in the fourth quarter of 2015.

### B.     Road Show Materials

147.     The Road Show Materials[4] issued in connection with the IPO contained materially false and/or misleading facts, omitted to state other facts necessary to make the statements made not misleading, and were otherwise not prepared in accordance with the governing rules and regulations.

148.     Defendant Blatt, in the Road Show Materials, in relevant part, stated:

> [The Princeton Review] has been a minor drag on our P&L this past year as we consolidated our acquisitions in the area, and ***we have no expectation of this being a business that requires us to go negative in order to grow it into what we think it can be.  You sleep on this one, but just like no one paid attention to HomeAdvisor or Vimeo at IAC a few years ago, and we told people it would be a real value contributor in a few years, we think The Princeton Review can be a real value-creation opportunity in a few years from now for Match Group.***

(emphasis added).

149.     Defendant Swidler, in the Road Show Materials, in relevant part, stated:

> Our business, by its nature, has low capital requirements and there's significant operating leverage in our business.  This comes from operational efficiencies that we are in the process of achieving, plus improving performance at The Princeton Review and well as at Tinder as it continues on its trajectory.

150.     The Roadshow Materials further reiterated the positive performance and outlook of TPR by labeling TPR as a "big business opportunity" and assuring potential investors that it was "Not expected to require investment going forward":

---

[4]   As used herein, the term "Road Show Materials" refers to, collectively, Defendant Blatt and Defendant Swidler's prepared remarks from November 2015, as well as Match Group's slideshow from November 2015.



151.    The above statements were false and misleading because they failed to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; failed to disclose known trends or uncertainties that were reasonably likely to unfavorably impact net sales, revenue, or income from continuing operations; and failed to include adequate risk disclosures relating to:  (i) decrease in sales due to changes in the SAT; (ii) decrease in sales due to the College Board's partnership with Khan Academy to provide free test prep; and (iii) the Company's decision to shift focus from revenue growth to margin expansion, including its related decision not to renew lucrative large contracts, reduction in sales and marketing efforts and budgets, and decision to migrate traditional business to online.

## VII.   NO SAFE HARBOR

152.    Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO.  The Safe Harbor provision of § 27A of the Securities Act, 15 U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with the

initial public offering," which includes all of the false and misleading statements made in connection with the IPO.

## VIII.   CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired Match Group common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO on November 19, 2015 and who were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, members of the immediate families of each Defendant, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

154.    The members of the Class are so numerous that joinder of all members is impracticable.  Match Group offered 38,333,333 shares of Class A common stock and 209,919,402 shares of Class B common stock in the IPO and is actively traded on the NASDAQ.  While the exact number of Class members are unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Match Group or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

155.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

156.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

157.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether Sections 11 and 15 of the Securities Act were violated by Defendants' acts as alleged herein;

b)      whether statements made by Defendants to the investing public in the Registration Statement issued by Match Group in connection with the IPO negligently omitted and/or misrepresented material facts about the business and prospects of Match Group; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

158.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of the individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    CLAIMS FOR RELIEF

### A.    COUNT I:  For Violations of Section 11 of the Securities Act (Against All Defendants)

159.    Plaintiffs repeat and reallege each and every allegation contained above.  This Count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement.

160.     This Count does not sound in fraud.  Any preceding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege for this Count that Defendants had scienter or fraudulent intent, which are not elements of this claim.

161.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C.§ 77k, on behalf of the Class, against all Defendants.

162.     As discussed herein, the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

163.     Match Group is the registrant for the IPO.  The Individual Defendants are responsible for the contents of the Registration Statement based upon their status as directors of the Company or because they signed or authorized the signing of the Registration Statement on their behalf pursuant to Section 11(a)(1-3) of the Securities Act.  The Underwriter Defendants are responsible for the contents of the Registration Statement pursuant to Section 11(a)(5) of the Securities Act.

164.     As issuer of the shares, Match Group is strictly liable to Plaintiffs and the Class for any misstatements and omissions.  The Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

165.     By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

166.    Plaintiffs acquired Match Group common stock pursuant and/or traceable to the Registration Statement for the IPO.

167.    Plaintiffs and the Class have sustained damages.  The value of Match Group's common stock has declined substantially subsequent to and due to Defendants' violations.

168.    At the time of their purchases of Match Group securities, Plaintiffs and the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

**B.    COUNT II:  For Violations of Section 15 of the Securities Act (Against the Individual Defendants)**

169.    Plaintiffs repeat and reallege each and every allegation contained above.

170.    This Count does not sound in fraud.  Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege for this Count that Defendants had scienter or fraudulent intent, which are not elements of this claim.

171.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

172.    Each of the Individual Defendants acted as controlling persons of Match Group within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior officer of Match Group.  By reason of their senior management positions and/or directorships at the Company, as alleged above, the Individual Defendants, individually and acting

pursuant to a common plan, had the power to influence and exercised the same to cause Match Group to engage in the conduct complained of herein.  Further, the Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

173.    Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the IPO Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

174.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs the costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements; and

D.    Awarding such equitable, injunctive, or other relief as this Court may deem just and proper.

## XI.    JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  October 30, 2017               KENDALL LAW GROUP, PLLC


By:   *Joe Kendall*
           Joe Kendall
           Texas Bar No. 11260700
           jkendall@kendalllawgroup.com
           Jamie J. McKey
           Texas Bar No. 24025262
           jmckey@kendalllawgroup.com
           3232 McKinney, Suite 700
           Dallas, TX 75204
           Telephone:  (214) 744-3000
           Facsimile:  (214) 744-3015

           *Liaison Counsel for Lead Plaintiffs and the Class*

           GLANCY PRONGAY & MURRAY LLP
           Lionel Z. Glancy
           Kara M. Wolke
           Alexa J. Mullarky
           1925 Century Park East, Suite 2100
           Los Angeles, CA 90067
           Telephone:  (310) 201-9150
           Facsimile:  (310) 201-9160
           info@glancylaw.com

           BRAGAR EAGEL & SQUIRE, P.C.
           Lawrence P. Eagel
           Jeffery H. Squire
           Melissa A. Fortunato
           Todd H. Henderson
           885 Third Avenue, Suite 3040
           New York, NY 10022
           Telephone:  (212) 308-5858
           Facsimile:  (212) 846-0462
           walker@bespc.com

           *Co-Lead Counsel for Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon counsel of record through the Court's ECF system on October 30, 2017.

*/s/ Joe Kendall*
Joe Kendall