# United States District Court
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| MARY McCLOSKEY, et al., | § | |
| --- | --- | --- |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:16-CV-549-S |
| | § | |
| MATCH GROUP, INC., et al., | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants Match Group, Inc. ("Match Group"); Gregory R. Blatt; Gary Swidler; Michael H. Schwerdtman; Gregg J. Winiarski; and Joseph M. Levin's (the "Individual Defendants" and collectively with Match Group, the "Match Group Defendants") Motion to Dismiss the Second Amended Class Action Complaint [ECF No. 62] and Defendants JP Morgan Securities, LLC; Allen & Company, LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; Deutsche Bank Securities Inc., BMO Capital Markets Corp.; Barclays Capital Inc.; BNP Paribas Securities Corp.; PNC Capital Markets LLC; Cowen & Company, LLC; SG Americas Securities, LLC; Fifth Third Securities, Inc.; and Oppenheimer & Co. Inc.'s (collectively, the "Underwriter Defendants") Motion to Dismiss the Second Amended Class Action Complaint [ECF No. 64]. For the following reasons, the Court grants both Motions.

## I. BACKGROUND OF THE CASE

### *A. Procedural History*

This case is a putative class action alleging violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against the Match Group Defendants and the

1

Underwriter Defendants. Per Special Order 3-3-18, this case was transferred from the docket of Judge Sam. A. Lindsay to the docket of this Court on March 8, 2018.

On February 26, 2016, Plaintiff David M. Stein filed a Class Action Complaint. Plaintiff Stephany Kam-Wan Chan filed a second Class Action Complaint on March 9, 2016, asserting identical claims against the same defendants. On April 28, 2016, the Court consolidated these two cases. On June 9, 2016, the Court appointed Plaintiffs Mary McCloskey and Craig Kneller to serve as lead plaintiffs ("Plaintiffs"). Plaintiffs filed the Amended Complaint on September 9, 2016. On November 8, 2016, the Match Group Defendants and the Underwriter Defendants each filed a motion to dismiss. On September 27, 2017, the Court denied the motions to dismiss without prejudice and ordered Plaintiffs to cure the deficiencies outlined in the motions (the "Lindsay Order"). On October 30, 2017, Plaintiffs filed the Second Amended Complaint. The Match Group Defendants and the Underwriter Defendants each filed a second motion to dismiss on December 14, 2017.

The parties appeared before this Court for oral argument on the pending motions on June 19, 2018.

### *B. Origins of the Claim*

The facts set out here are taken primarily from the Second Amended Complaint ("SAC"). Plaintiffs bring this putative class action against the Match Group Defendants and the Underwriter Defendants on behalf of themselves and all other persons or entities who purchased or acquired Match Group securities pursuant or traceable to the Match Group's Registration Statement and Prospectus issued in connection with the company's Initial Public Offering ("IPO"), which commenced on November 19, 2015. SAC ¶ 1. Plaintiffs allege that the Registration Statement issued in connection with the IPO contained materially false and/or misleading facts, omitted other

2

facts necessary to make the statements not misleading, and was otherwise not prepared in accordance with the governing rules and regulations in violation of Sections 11 and 15 of the Securities Act. *Id.* ¶ 141.

Match Group has two reportable segments: (1) dating, which consists of all of the company's dating businesses globally (the "Dating Business"), and (2) non-dating, which consists of its educational services and the test preparation business (the "Non-Dating Business"). *Id.* ¶¶ 47, 55. In its Dating Business, Match Group operates a portfolio of approximately 45 dating products including Match.com, OkCupid, Tinder, PlentyOfFish, and OurTime. *Id.* ¶¶ 44, 47. In 2014, Match Group purchased The Princeton Review to expand its Non-Dating Business. *Id.* ¶ 2. According to the IPO Registration Statement, Match Group "operate[s] a non-dating business in the education industry through ownership of The Princeton Review. The Princeton Review provides a variety of test preparation, academic tutoring, and college counseling services." *Id.* ¶ 56. The Princeton Review offers test preparation services for K-12 standardized exams and college and graduate-level admissions tests, including the SAT, PSAT, ACT, GRE, LSAT, and AP exams. *Id.* ¶¶ 58-59. The Princeton Review generates approximately ten percent of Match Group's total revenue. *Id.* ¶ 57.

Historically, The Princeton Review primarily offered its test preparation and college admissions services to students through large, institutional contracts. *Id.* ¶ 63. Following the acquisition of The Princeton Review in 2014 and prior to the November 2015 IPO, Match Group began to transition the focus of The Princeton Review from large multiyear contracts with institutional clients to pay-as-you-go packages and online sales to individual students. *Id.* ¶ 64. In addition, The Princeton Review shifted its focus from in-person training and in-classroom test prep to online courses and webinars. *Id.* ¶ 68. In March 2014, the College Board announced its

intention to expand students' access to opportunity and redesign the SAT. *Id.* ¶ 84. As part of this initiative, the College Board announced it would partner with Khan Academy to provide free test preparation materials for the redesigned SAT. *Id.* ¶ 85.

According to Plaintiffs, Match Group publicly claimed to expect an increase in The Princeton Review's SAT prep sales and overall revenue in the second half of 2015. *Id.* ¶ 91. Plaintiffs allege that although the introduction of Khan Academy's free SAT prep materials and the changes to the SAT presented significant risks to Match Group's Non-Dating Business, Match Group failed to warn investors of these risks in the Registration Statement and Prospectus. *Id.* ¶ 98. Additionally, Plaintiffs allege that Defendants made a material omission by not disclosing the delayed execution of a large institutional tutoring contract with the U.S. government in the offering materials. *Id.* ¶ 99.

On November 19, 2015, the IPO was priced at $12.00 per share. *Id.* ¶ 105. For the fourth quarter of 2015, Match Group reported total revenue of $268 million—falling short of the consensus analyst estimate of $277 million. *Id.* ¶ 115. Match Group reported (1) Non-Dating Business revenue of $26.1 million, below the company's internal estimate of $31.2 million and (2) Dating Business revenue of $241.5 million, in line with the consensus estimate of $241.4 million. *Id.* In Match Group's prepared remarks, published immediately before the fourth quarter 2015 conference call, Match Group disclosed, "Non-Dating fell short of expectations on revenue in Q4 due primarily to a greater than anticipated slowdown in SAT prep due to the launch of a new SAT and the execution of an institutional contract later in Q4 than expected." *Id.* ¶ 116. During the 2015 fourth quarter conference call, Match Group reiterated these points. *Id.* ¶ 117. Following these announcements, Match Group's stock fell from a high of $12.82 per share on February 2, 2016, to $9.30 per share on February 5, 2016. *Id.* ¶ 125.

4

Plaintiffs assert two claims in the Second Amended Complaint. Count I alleges that the Match Group Defendants and the Underwriter Defendants violated Section 11 of the Securities Act by making false and materially misleading statements in the Registration Statement. Count II alleges that the Individuals Defendants are liable as control persons pursuant to Section 15 of the Securities Act.

## III. LEGAL STANDARD

### *A. The Rule 12(b)(6) Standard*

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

In ruling on a Rule 12(b)(6) motion, the court limits its review to the face of the pleadings. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). However, the court may also consider documents outside of the pleadings if they fall within certain limited categories. First, the "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, the "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Third, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (internal citations omitted); *see also, e.g., Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand." (internal citations omitted)).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

### III. ANALYSIS

#### A. Section 11 Claim

To state a claim under Section 11 of the Securities Act, a plaintiff must allege facts showing that the offering documents "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Whether a claim is based on an alleged misstatement or omission, the misstated or omitted information must be material "when read in the context of the prospectus as a whole." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 211-12 (5th Cir. 2004). Information is material if "'there is a substantial likelihood that a reasonable shareholder' would consider it important in making an investment decision." *Id.* at 213-14 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1998)). Moreover, "[f]or an omission to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* (quoting *Basic*, 485 U.S. at 231-32).

Plaintiffs allege that Match Group violated Section 11 of the Securities Act by (1) making materially false or misleading statements in the offering materials, (2) failing to include information required by Item 303 of Regulation S-K, and (3) failing to disclose risk factors associated with the Non-Dating Business as required by Item 503 of Regulation S-K.

#### *(1) Materially False or Misleading Statements*

Plaintiffs allege that the Registration Statement issued in connection with the IPO contained materially false and/or misleading facts and omitted other facts necessary to make the statements not misleading. SAC ¶ 141. In support of this allegation, Plaintiffs point to the following statements from Match Group's Registration Statement:

(1) "Non-dating reported positive Adjusted EBITDA for the first time in the third quarter of 2015, which is its seasonally strongest quarter." (*Id.* ¶ 142)

(2) "The increase in deferred revenue is primarily due to growth in membership fees in the Dating business, a seasonal increase in class enrollment in the Non-dating business and acquisitions." (*Id.* ¶ 143)

(3) For the nine months ended September 30, 2015, "Non-dating Adjusted EBITDA loss declined $4.8 million, or 45.8% primarily to reduced losses from The Princeton Review." (*Id.* ¶ 144)

According to Plaintiffs, the above statements were false and misleading because they failed to state material facts necessary to make the statements—in light of the circumstances under which they were made—not misleading. Plaintiffs allege that Match Group failed to disclose that The Princeton Review's test prep sales were decreasing and Match Group's overall Non-Dating Business revenue was declining due to (i) changes in the SAT; (ii) the College Board's partnership with Khan Academy; (iii) Match Group's decision to shift the focus of The Princeton Review; and (iv) the delayed large institutional contract which was executed late in the fourth quarter of 2015. *Id.* ¶ 145. Plaintiffs do not allege that Match Group reported inaccurate historical results or that it made predictions about future performance. Rather, Plaintiffs allege that the statements were misleading because "investors were lead to believe" that the Non-Dating Business "had turned a corner" and would be profitable in Quarter 4 of 2015 and beyond. *Id.* ¶¶ 5, 7, 114.

The Court finds that Plaintiffs fail to plausibly allege that the registration statement for Match Group's IPO "contained an untrue statement of material fact." 15 U.S.C. § 77k(a). The statements identified by Plaintiffs are true and accurate statements of past results. Match Group stated that the Non-Dating Business was profitable for the first time in the third quarter of 2015, but the company made no projections or representations about the future performance of that business. *See In re CompUSA, Inc. Securities Litig.*, 1995 WL 811960 (N.D. Tex. Oct. 30, 1995)

("[S]tatements regarding the historical performance of a company 'contain no implicit prediction that those events will continue in the future.'"). Match Group expressly warned investors, "Our historical results are not necessarily indicative of the results to be expected for any future period." Match Group Defs.' App., Ex. A at 12.

Courts have consistently rejected attempts by plaintiffs to plead falsity based on accurate reports of historical performance. In *Kapps*, the Fifth Circuit affirmed the dismissal of claims similar to those pleaded here. *See* 379 F.3d at 221. The plaintiffs in *Kapps* argued that a "technically accurate" statement that natural gas prices had "increased by approximately 133%" between February 1999 and June 2001 was materially misleading because it "failed to mention" that prices had declined by 60 percent in the five-month period "immediately preceding the IPO." *Id.* The court rejected this argument, reasoning that "[t]he statement correctly set forth the increase in the price of natural gas during a specified period of time" and was therefore not actionable under the Securities Act. *Id.* at 211-12.

Here, Match Group accurately reported its historical results in the Non-Dating Business for a specified period and made no projections or representations about the future performance of that business. When viewed in context, and taking into consideration the cautionary language that historical results are not indicative of future results, none of the statements at issue was materially misleading. There is no substantial likelihood that including the facts alleged by Plaintiffs to be omitted "would have significantly altered a reasonable investor's perception of the total mix of information available in the prospectus as a whole." *Kapps*, 379 F.3d at 216 (internal citations and quotations omitted).

The Court therefore dismisses Plaintiffs' Section 11 claim based on the theory that Defendants made a materially false or misleading statement in the offering materials.

### *(2) Material Omission under Item 303*

Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 303 applies only where "material events and uncertainties known to management . . . would cause reported financial information not to be necessarily indicative of future operating results or of future financial conditions." *Id.* at Instruction 3. "'Item 303(a)(3)(ii) essentially says to a registrant: If there has been a change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus.'" *Kapps*, 379 F.3d at 218 (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002)).

To establish a disclosure obligation under Item 303, a plaintiff must sufficiently allege that a trend or uncertainty is both "(1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." SECURITIES ACT RELEASE NO. 33-6835, 1989 WL 1092885, at *4 (May 18, 1989). Item 303 does not require issuers to "anticipat[e] a future trend or event" or a "less predictable impact of a known event, trend, or uncertainty." *Id.* at *4-*5.

Plaintiffs allege that Defendants violated their disclosure obligations in Match Group's IPO Registration Statement because they failed to disclose (1) The Princeton Review's transition from institutional contracts and long-term revenue growth to direct-to-student and online sales and margin expansion; (2) the risks posed by the introduction of the new SAT; (3) the risks posed by the College Board's relationship with Khan Academy, a competitor of The Princeton Review; and (4) the delayed institutional contract. SAC ¶ 136.

The Court finds that Plaintiffs fail to plausibly allege a material omission of information required to be disclosed under Item 303. First, Plaintiffs' contention that Match Group should have disclosed that prior to the IPO there was a shift in focus in the Non-Dating Business ignores the IPO disclosures. Match Group expressly disclosed that "[s]ubstantially all of our revenue from our non-dating business . . . is derived directly from our students," and that a meaningful portion of such revenue was attributable to "online test preparation classes" and "access to online test preparation materials. Match Group Defs.' App. 67, 114. Furthermore, Plaintiffs fail to plead any facts to quantify the impact of the purported shift in the Non-Dating Business. In the absence of any such allegations, Plaintiffs cannot establish that the shift was likely to have a material impact on Match Group's total revenue. *See* SECURITIES ACT RELEASE NO. 33-6835, 1989 WL 1092885, at *4.

Second, with regard to the SAT redesign, Plaintiffs do not plead sufficient facts that could establish a "trend" at the time of the IPO with respect to declining Non-Dating Business revenue attributable to the redesigned SAT—much less a trend that would have been material in the context of Match Group's overall revenue. Plaintiffs fail to plead sufficient facts explaining why any observed impact on revenues would reasonably have been expected to persist long-term, once the new SAT went into effect. Furthermore, Plaintiffs fail to plead sufficient facts to establish how, if at all, the SAT redesign would have a material effect on Match Group's financial condition or results of operations. Plaintiffs acknowledge that Match Group's Non-Dating Business consists of (1) educational services and (2) the test preparation business. *See* SAC ¶¶ 56-62. The test preparation business includes test prep services for K-12 standardized exams and college and graduate-level admissions tests, including the SAT, PSAT, ACT, GRE, GMAT, LSAT, MCAT, and AP exams. *Id.* Plaintiffs fail to allege sufficiently how a proposed redesign on the SAT—

only one of the many standardized tests that Match Group offered test preparation services for—would significantly or materially decrease the predictive value of Match Group's reported results.

Third, as to the College Board's partnership with Khan Academy, the only fact Plaintiffs plead that attempts to quantify the effect of this purported trend on Match Group's business is an irrelevant one. Plaintiffs allege that in 2016, months after the IPO, the College Board announced that its initiative had "caus[ed] a 19 percent drop in the number of students who paid for SAT prep resources." SAC ¶ 19. This fact is outside the scope of the analysis because it was not available to Match Group—or anyone else—at the time of the IPO. Even though the College Board's partnership with Khan Academy was public information at the time of the IPO, Item 303 does not require issuers to speculate on "a future trend or event" or a "less predictable impact of a known event, trend, or uncertainty." SECURITIES ACT RELEASE NO. 33-6835, 1989 WL 1092885, at *4-5

Finally, as to the delayed government contract, Plaintiffs do not allege that this was a particularly important contract or that the delay was a symptom of broader issues that were reasonably likely to affect the business over the long term. Disclosure is not required under Item 303 unless there is an "observed pattern" that "reflects persistent conditions of the particular registrant's business environment." *Kapps*, 379 F.3d at 217. A delay affecting a single contract in a non-core business segment would not be the sort of information that is required to be disclosed under Item 303. There was no "observed pattern" that reflected a persistent downward trend of the Non-Dating Business. *Id.*

For the reasons stated above, the Court dismisses Plaintiffs' claim under Item 303 of Regulation S-K.

### *(3) Material Omission under Item 503*

Item 503 of Regulation S-K requires a company to provide "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). Item 503 provides examples of the sort of risk factors that might warrant discussion, including a company's "lack of operating history," "lack of profitable operations in recent periods," or the "lack of a market for [the issuer's] common equity securities." *Id.* Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Securities Offering Reform, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004).

Plaintiffs allege that Match Group made a material omission under Item 503 by failing to disclose the risks posed by the alleged shift in focus of The Princeton Review's business and the risks associated with contract delays in Match Group's Non-Dating Business. SAC ¶¶ 138, 140. According to Plaintiffs, while the Registration Statement contains numerous risk disclosures relating to its Dating Business, there are no risk disclosures that relate directly to Match Group's Non-Dating Business. *Id.* ¶ 109. Plaintiffs contend that only two generalized risk disclosures in the Registration Statement could conceivably relate to risks associated with the Non-Dating Business. *Id.*

The Court finds that Plaintiffs fail to plausibly allege a material omission of information required to be disclosed under Item 503. The omitted risks alleged by Plaintiffs cannot be said to be the "most significant factors" that made the offering "speculative or risky". 17 C.F.R. § 229.503(c); *see also Plymouth Cty. Ret. Assoc. v. Primo Water Corp.*, 966 F. Supp. 2d 525, 560 (M.D. N.C. 2013) (finding that defendant's overstatement of store locations, insufficient marketing practices, decreasing or nonexistent growth opportunities, and poor sales performance were not "among the most significant risk factors making the Offerings speculative or risky."); *In re UBS*

13

*AG Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *30 (S.D.N.Y. Sept. 28, 2012) (determining that uncharged illegal conduct involving a minor business unit could not "be described as among the 'most significant factors' making the 2008 Rights Offering speculative or risk" under Item 503(c)). Similar to Plaintiffs' Item 303 claims, Plaintiffs fail to allege sufficient facts to quantify how the alleged shift in focus of The Princeton Review and the delayed contract were significant or material to the Non-Dating Business revenue, much less Match Group's overall revenue. *See supra* Section III.A.2. As a result, Plaintiffs fail to show that one of the "most significant factors making [the] IPO risky" was omitted from the offering materials. *Milano v. Perot Sys., Corp.*, 2006 WL 929325, at *19 (N.D. Tex. Mar. 31, 2006).

Furthermore, the risk that actually occurred—a temporary stock price decline following Match Group's underperformance relative to analyst estimates—was expressly disclosed to investors.[1] In the offering documents, Match Group notably cautioned that a "failure to meet [the] expectations" of the "analysts that cover [the] company" could cause a drop in its stock price. Match Group Defs.' App. 28.

For the foregoing reasons, the Court dismisses Plaintiffs' claims under Item 503 of Regulation S-K.

### *B. Section 15 Claim*

Plaintiffs also assert a "control person" claim under Section 15 of the Securities Act against the Individual Defendants. This provision imposes liability on those who "controlled" any person liable for a primary violation of the relevant securities laws. 15 U.S.C. § 77o(a). Control person

---

[1] Determining whether a complaint states a plausible claim is context specific, requiring the Court to draw on its experience and common sense. *Iqbal*, 556 U.S. at 679. The Court notes that Match Group's stock price is now trading at more than three times the IPO price. Mot. Hr'g Tr. 11:16-21; *see also Match Group Inc. NASDAQ Stock Quote*, BLOOMBERG L.P. (Aug. 23, 2018), https://www.bloomberg.com/quote/MTCH:US (stock price of $48.26 as of market open).

14

liability is secondary only and cannot exist in the absence of a primary violation. *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 383 (5th Cir. 2004).

Plaintiffs' Section 15 control person claim fails because Plaintiffs have failed to allege a primary violation under the Securities Act. Therefore, the Court dismisses Plaintiffs' Section 15 control person claim against the Individual Defendants.

## IV. CONCLUSION

For the reasons stated above, the Court grants both the Match Group Defendants' Motion to Dismiss and the Underwriter Defendants' Motion to Dismiss. In denying the previous motions to dismiss without prejudice and allowing Plaintiffs the opportunity amend their pleadings, the Court stated, "Although the [C]ourt has concerns whether Plaintiffs can allege facts to support the securities claims asserted, it is unclear at this juncture whether allowing them to amend their pleadings would be futile." Lindsay Order 1. The Court now finds that further amendment would be futile. Plaintiffs were given the opportunity to amend, and failed to cure the deficiencies set forth in the Match Group Defendants' and Underwriter Defendants' previous motions to dismiss. Therefore, Plaintiffs' claims are dismissed with prejudice and without leave to amend.

**SO ORDERED.**

SIGNED August 24, 2018.

_____
**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**